United States District Court
District of Massachusetts

```
_____
                                )
ORIX CAPITAL MARKETS, LLC IN ITS)
CAPACITY AS SPECIAL SERVICER AND)
ATTORNEY-IN-FACT FOR WELLS FARGO)
BANK, N.A. FORMERLY KNOWN AS    )    Civil Case No.
WELLS FARGO BANK MINNESOTA,     )    10-12019-NMG
N.A., AS TRUSTEES FOR REGISTERED)
HOLDERS OF SALOMON BROTHERS     )
MORTGAGE SECURITIES VII, INC.,  )
COMMERCIAL MORTGAGE PASS-THROUGH)
CERTIFICATE SERIES 2000 C-2,    )
         Plaintiff,             )
                                )
     v.                         )
                                )
CADLEROCKS CENTENNIAL DRIVE, LLC,)
DANIEL CADLE,                   )
         Defendants.            )
                                )
_____)
```

MEMORANDUM OF DECISION

GORTON, J.

This case involves a dispute between a lender and the borrower and guarantor, with respect to a loan and a mortgage on commercial property in Peabody, Massachusetts.

This Court, sitting without a jury, presided over a three-day trial of this case in December, 2012. The Court now announces its findings of fact and conclusions of law.

I. **Findings of Fact**

   **A. The Parties**

   1. Defendant Cadlerocks Centennial Drive, LLC ("Cadlerocks"

or "Borrower") is a Massachusetts limited liability company.

2. Cadlerocks' sole asset is a 4.63 acre mixed-use commercial and industrial property located at One Centennial Drive, Peabody, Massachusetts ("the Property"). A 50,000 square foot warehouse built in 1964 is located on the Property.

3. Defendant Daniel Cadle ("Cadle") is the President of The Cadle Company, the sole manager of Cadlerocks. The Cadle Company is not a party to this case. Cadle is an experienced banker and debt collector, with over 40 years experience with financial matters.

4. Wells Fargo Bank, N.A., f/k/a Wells Fargo Bank Minnesota, N.A., as Trustee for the registered holders of Salomon Brothers Mortgage Securities VII, Inc., Commercial Mortgage Pass-Through Certificates, Series 2000 C-2 ("the Trust") is the current holder of a promissory note reflecting a loan to Cadlerocks, and is the senior secured lien holder with respect to Cadlerocks and the Property.

5. ORIX Capital Markets LLC ("ORIX") is the special servicer of the Trust and acts pursuant to a Limited Power of Attorney from the Trust to ORIX.

**B. The Loan**

6. Cadlerocks entered into a loan with lender Salomon Brothers Realty Corp. ("Original Lender") in the principal amount of $1,925,000. A Promissory Note with an effective date of

December 14, 1999 ("the Note") memorialized that loan.

7. The Note was secured by a Mortgage, Assignment of Rents and Security Agreement from Borrower to Original Lender ("the Mortgage"), along with an Assignment of Leases and Rents, Exceptions to Non-Recourse Guaranty ("the Guaranty") and an Environmental Indemnity Agreement.

8. Cadle signed both the Guaranty and Environmental Indemnity Agreement in his personal capacity and was assisted with respect to the origination of the subject loan by his in-house counsel, Victor Buente.

9. At the time of the loan the building on the Property was over 35 years old.

10. The Original Lender assigned the Mortgage, Note, Assignment of Leases and Rents, Guaranty, Environmental Indemnity Agreement and all other loan documents to the Trust on August 21, 2000.

**C. Environmental Indemnity Agreement and Environmental Insurance Policy**

11. As a part of the closing documents Cadlerocks executed an Environmental Indemnity Agreement agreeing to indemnify the lender for all costs and damages related to any "suspected" or actual presence of "Hazardous Materials" at the Property.

12. Cadle also executed the Environmental Indemnity Agreement in his personal capacity.

13. The Environmental Indemnity defines "Hazardous

Substance" to include any

> hazardous air pollutants, hazardous substances, hazardous materials, regulated substances, restricted hazardous wastes, . . . hazardous chemical substances, . . . toxic substances, pollutants or contaminants or terms of similar import, as such terms are defined in any Environmental Law . . . [and] any substance or material which now or in the future is known to constitute a threat to health, safety . . . or exposure to which is prohibited, limited or regulated by any Environmental Law or Governmental Entity, including all of those materials, wastes and substances designated now or in the future as hazardous or toxic by any Governmental Entity.

14. A Phase I Environmental Site Assessment ("Phase I") conducted prior to the closing of the loan revealed the presence of airborne tetrachloroethylene, also known as perchloroethylene ("PCE") at the Property, likely caused by the use of degreasing agents by a long-past tenant, New England Carbide.

15. At the time that defendants entered into the loan agreemnt they were also aware of historic inspections that had revealed the presence of PCE on the Property.

16. PCE is a known carcinogen and is listed as a hazardous substance in the Massachusetts Contingency Plan, 310 CMR 40.1600 (2012).

17. Instead of paying for a more comprehensive "Phase II" inspection, Cadlerocks paid $20,945 at the time of closing for an environmental insurance policy ("the Insurance Policy"). Original Lender was the insured under the policy but Cadlerocks did not receive a copy of that policy.

18. Cadle testified that, he took no steps to obtain a copy

of the Insurance Policy, other than having his in-house counsel, Victor Buente, call the brokerage company that had placed the policy but only after the trial in this case had commenced.

19. At trial, Cadle produced an unexecuted "Secured Creditor Impaired Property Policy" on the Property dated October 29, 1999 with a ten-year policy term.

### D. Default

20. In December, 2009, the subject loan was assigned to ORIX just before the maturity default which occurred on January 1, 2010.

21. The balance due on the Note at the Maturity Date was $1,464,935 and, because Borrower failed to make that payment, it defaulted on the Note.

22. Cadlerocks continued to make monthly principal and interest payments on the Note of $24,889 until August 2010 after which no further payments were made.

23. As of April 2, 2012, the balance due on the loan was $2,151,058, which included $1,739,494 in principal.

24. After the maturity default and unsuccessful discussions with Cadlerocks regarding a loan modification, the Trust decided to foreclose on the Property.

### E. Receivership

25. In order to settle all claims, Cadle twice offered ORIX the Property via a so-called "deed-in-lieu", meaning a transfer

of title without recourse.

26. As part of ORIX's routine due diligence prior to foreclosure it ordered a Phase I Environmental Site Assessment ("Phase I") from EBI Consulting ("EBI"). Zeba Ansari ("Ansari"), the ORIX employee who processed the subject loan, testified that ORIX's practice and policy is to conduct a Phase I before any property is acquired by a deed-in-lieu.

27. The Phase I in this case identified the presence of PCE.

28. ORIX rejected the offer of a deed-in-lieu, cancelled the foreclosure sale and sought the appointment of a Receiver for the Property.

29. Cadlerocks assented to the appointment of a Receiver on December 8, 2010 (Docket No. 12) and this Court appointed Francis Morrissey, Esq. as Receiver on December 15, 2010 (Docket No. 13).

**F. Environmental Testing**

30. Based upon the results of the Phase I, ORIX ordered follow-on Limited Subsurface Investigation ("Phase II") of the Property by EBI.

31. The Phase II, which was conducted in December, 2010, consisted of two components: a) testing the tank integrity of an underground storage tank ("UST") on the Property and b) conducting a soil vapor investigation on the exterior of the subject building. The purpose of an exterior soil vapor test was

to determine whether there was potential vapor intrusion into the interior of the building on the Property.

32. The UST passed the tank integrity test but the soil vapor testing identified PCE present in the soil exterior to the building.

33. As a result of the Phase II, EBI recommended a test of the indoor air quality. Mark Germano, the Licensed Site Professional who supervised the earlier EBI testing, testified that he believed follow-on air testing was necessary in view of results of EBI's tests.

34. EBI conducted follow-on indoor air quality testing in the building at the Property on several days in March, 2011. A so-called "grab" test was performed to determine whether certain hazardous substances were present but not the rate of exposure of an occupant over an extended period of time.

35. EBI's indoor air testing indicted the presence of PCE in an area of the building that houses a daycare center. The testing showed a concentration of 1.65 µg/m3 of PCE which is above the the Massachusetts Department of Environmental Protection ("MADEP") advisory limit for residential indoor air quality of 1.4 µg/m3.

36. In response to the results indicating an indoor presence of PCE, the Receiver engaged his own team of professionals including Licensed Site Professional James Young

("Young") and environmental counsel, McGregor and Associates. The Court approved the Receiver's engagement of McGregor & Associates (Docket No. 33).

37. Young conducted follow-on indoor air testing on June 24, 2011. He collected 8-hour air samples, a time period chosen to approximate the exposure of occupants of the building.

38. The results from Young's 8-hour tests showed the presence of PCE in the daycare space but not in concentrations that exceeded MADEP regulations.

39. On July 9, 2011, Young collected 24-hour air samples in the daycare center with the ventilation turned off. Those conditions were created to simulate the "worst case" scenario to which occupants might be exposed. The results showed the presence of PCE in the daycare space but, again, not in concentrations that violated MADEP regulations.

40. The Receiver engaged in follow-on environmental testing in the fall of 2012 as part of his effort to market and sell the Property. That testing was performed to satisfy concerns of prospective purchasers regarding potential environmental conditions on the Property, including the presence of PCE. Test data 6 months old is considered "stale" by the industry and MADEP because conditions related to environmental contamination can change over time. The 2012 environmental testing included groundwater testing, soil borings and indoor air testing.

41. The Receiver requested that Cadlerocks pay the Receiver's costs related to environmental testing, a request to which Cadlerocks did not reply.

42. The Receiver then requested that ORIX pay all of the Receiver's costs and fees with respect to testing for the presence of PCE on the Property. ORIX agreed that the Receiver could draw down on income and sales proceeds generated from the Property that would otherwise have been applied to pay down Cadlerocks' debt.

43. Young and Germano, both Massachusetts Licensed Site Professionals, credibly testified that the testing performed in 2010, 2011 and 2012 was reasonable and necessary.

### G. Property Condition

44. A representative of Original Lender visited the Property and conducted an inspection prior to making the loan in 1999.

45. Capstone Properties, Inc. ("Capstone") served as property manager for the Property from 1997 until the appointment of the Receiver in 2010. Original Lender approved the appointment of Capstone.

46. Paul Griesinger ("Griesinger"), President of Capstone, oversaw maintenance and repairs at the Property and viewed the Property in 1999 and frequently thereafter until the Receiver took control in 2010.

47. Based upon Griesinger's unrebutted testimony, the Court

finds that in 1999 the building had deferred maintenance issues typically associated with a building more than 30 years old such as roof leaks, various issues with the HVAC system, deterioration around the loading docks, masonry deterioration requiring repointing, etc.

48. Griesinger also credibly testified that the Property was in better condition in 2010 than it was in 1999, noting that there had been upgrades to sprinkler systems, HVAC, doors, walkways, bathrooms, and certain requested tenant renovations. Capstone carried out repairs when needed and kept the Property in "good repair."

49. Cadle, who inspected the Property in 1999 prior to the Loan, also testified, without contradiction, that due to the upgrades and ongoing repairs the Property was in as good or better condition in 2010 than it was in 1999. Cadlerocks spent approximately $30,000 per year on repairs and maintenance at the Property.

50. Both ORIX's counsel and Ansari admitted that ORIX had no evidence of the condition of the property in 1999.

51. In August, 2010, four months before the Property was put into receivership, ORIX commissioned Integra Realty Resources to conduct an appraisal of the property.

52. The Appraisal Report noted that

> overall the property appears to be in average condition . . . [and] has been reasonably well

maintained. [The inspection] did not reveal any significant deferred maintenance . . . [and] [t]he historical maintenance expenses reported to us are consistent with expenses of comparable properties.

53. In the fall of 2010, prior to the appointment of the Receiver, ORIX commissioned a Property Condition Report ("PCR") by EBI. EBI recommended significant immediate repairs in the amount of $113,964.

54. In February, 2012, ORIX ordered an update to the 2010 PCR. Charles Losinger performed a reinspection. His report, in February, 2012, recommended repairs in addition to those recommended in EBI's 2010 report, including a full roof repair and a new parking lot for an estimated total cost of $356,100.

## II. Conclusions of Law

### A. Standing

1. The Trust is the assignee and current holder of the Note, Mortgage, Assignment of Leases and Rents, Guaranty, Environmental Indemnity, and all other loan documents, and has standing to enforce the contractual provisions contained in those documents.

2. ORIX has the authority to prosecute this case on behalf of the Trust pursuant to a Limited Power of Attorney.

### B. Breach of the Guaranty

3. The Note was a non-recourse note, meaning that if Cadlerocks defaulted, the lender's remedy under the Note was

limited to the collateral.

4. Cadle executed the Guaranty in his personal capacity and under the terms of that Guaranty "irrevocably, absolutely and unconditionally" guaranteed payment of the "Guaranteed Obligations."

5.   Paragraph 30 of the Mortgage renders Cadle, as a result of the Guaranty, personally liable on a recourse basis for:

> a. "any failure to maintain, repair or restore the Property in accordance with any Loan Document to the extent not covered by insurance proceeds made available to the Lender";
>
> b. "any and all indemnities given by the Borrower to the Lender set forth in the Environmental Indemnity Agreement in connection with any environmental matter related to the Property"; and,
>
> c. "court costs and all attorneys' fees provided in any Loan Document."

6. The Guaranty includes an "Election of Remedies" clause, whereby the Lender (or its assigns) may take action against the guarantor

> without first exercis[ing] any rights against Borrower or any other Person, or exhaust any remedies available to it against Borrower under the Loan Documents or against any other person . . . or any other source or means of obtaining payment of any of the Guaranteed Obligations.

7. The Guaranty also includes a provision stating that

> Guarantors agree to pay all costs and out-of-pocket expenses, including court costs and expenses and reasonable fees and disbursements of legal counsel, incurred by or on behalf of Lender in connection with the enforcement of Guarantors' obligations under this Guaranty. . .

8. Under Section 6(d) of the Mortgage the Borrower is also required to

> keep the Property, including improvements, fixtures, equipment, machinery and appliances thereon in good repair and shall replace fixtures, equipment, machinery and appliances on the Property when necessary to keep such items in <u>good repair</u>.

(emphasis added). The Borrower's duty applies to Cadle by virtue of the Guaranty.

9. The Court concludes that "good repair" requires that the Property be maintained in as good condition as at the time of the loan origination. In this case the Property included a 35-year-old commercial building with significant wear and tear. The agreement did not require the Borrower or Guarantor to return the building to pristine condition as the plaintiff's damage experts suggest. If that were the case, Borrower would have been in breach the moment the loan was negotiated.

10. At trial plaintiff presented no evidence of the condition of the Property at the time the loan was made in 1999. The Original Lender was aware that the mortgage provided a right to recovery if the Property was not kept in good repair, yet plaintiff proffered no evidence of a pre-loan property inspection report.

11. Consequently, plaintiff is unable to rebut the testimony

of either Griesinger or Cadle that the Property was in better condition in 2010 than in 1999.

    12.  The only items that Cadle admitted were in worse condition at the time of default in 2010 than in 1999 were relatively minor items, i.e. a chain link fence, a sign, the glass in several windows and moderate disrepair of the parking lot.

    13.  The measure of damages for the failure to keep the Property in good repair is the fair market value of repair costs. See Concannon v. Galanti, 348 Mass. 71, 74 (1964) ("If the defect is remediable from the practical standpoint, recovery generally will be based upon the market price of completing or correcting the performance.")

    14.  The cost of fixing the items deemed to be in disrepair is as follows:

        a) for the sign, according to Griesinger, "a couple hundred dollars";

        b) for parking lot repairs, according to plaintiff's appraisal in 2010, $270;

        c) for repair and/or replacement of broken windows, $1,100; and

        d) for damages to the chain link fence, zero because no damages were claimed.

**C. Breach of the Environmental Indemnity Agreement**

    15.  The environmental testing conducted at the Property was reasonable and necessary, particularly given the Receiver's need

to ensure that conditions were safe for the occupants of the day care facility on the premises. The follow-up testing in 2012 was also reasonable in order for the Receiver to provide potential buyers with up-to-date information regarding environmental conditions. Plaintiff is entitled to recover the reasonable costs for that testing and analysis.

16.  Plaintiff is not, however, entitled to recover $2,650 for Phase I costs incurred by ORIX.  Ansari testified that ORIX routinely conducts that kind of investigation prior to all planned foreclosures.  Because ORIX would have conducted a Phase I regardless of any previous knowledge of the presence of PCE at the Property, that testing was not conducted in response to suspected environmental hazards and thus is not covered by the Environmental Indemnity Agreement.

17.  The Court approved the appointment of the Receiver but not the appointment of his partner Michael Zafiropoulos ("Zafiropoulos").  The Court will not, therefore, approve any bills submitted (or to be submitted) by Receiver for Zafiropoulos's time and those costs may not be passed along to ORIX.

18.  Defendants' claim that they are not responsible under the Environmental Indemnity Agreement because Cadlerocks purchased an Insurance Policy at the time of the loan origination is unavailing, because neither the Environmental Indemnity nor

any of the loan documents provide that such a policy relieves defendants from their obligations under the Environmental Indemnity. Rather, Section 7 of the Environmental Indemnity (Independent Remedies) and Section 6 of the Guaranty (Election of Remedies) expressly allow ORIX to pursue Cadle for damages notwithstanding the availability of insurance. Cadle's testimony that he and the Original Lender agreed to a verbal modification of the Environmental Indemnity is unenforceable pursuant to the Parol Evidence Rule. See Bank v. International Business Machines, 145 F.3d 420, 424 (1st Cir. 1998)

19. Defendants' affirmative defense that ORIX failed to mitigate its damages because it made no claim against the Insurance Policy is legally and factually deficient. Defendants bear the burden of persuasion and proof with respect to this affirmative defense, Heinrich v. Sweet, 44 F. Supp. 2d 408, 412 (D. Mass. 1999), and they did not produce a copy of the Insurance Policy at trial. As a result, the Court was unable to examine the terms of the Policy or to determine whether it would have covered the environmental testing plaintiff conducted at the Property regarding the presence of PCE.

20. Moreover, there was inconsistent evidence proffered with respect to the term of coverage under the Insurance Policy. Defendants produced an Executive Summary of the loan closing that indicated that "The Borrower has provided the Lender with a 15

year AIG Secured Creditor Impaired Property Policy." Defendants also produced an unsigned insurance policy with a 10-year term which would have expired well before the accrual of damages plaintiff now asserts. Without a signed copy of the actual Insurance Policy the Court cannot determine the length of coverage. Consequently, defendants have failed to prove their affirmative defense that reliance on Insurance Policy would have mitigated plaintiff's claimed environmental damages.

21. Defendants further allege that the costs and fees related to environmental testing and analysis should be offset by the proceeds from the sale of the Property and, therefore, are not cognizable against them. That contention ignores the fact that both the Guaranty and Environmental Indemnity contain Election of Remedies clauses which allow ORIX to recover from defendants without having to proceed directly against its collateral to satisfy the amounts due under the Environmental Indemnity. Further, the Court has conducted *in camera* review of letters of intent from prospective buyers and has determined that it is unlikely that the Property will be sold for more than the outstanding loan balance.

### D. Damages

Defendants are liable to plaintiff for the following damages:

<u>Property Condition</u>
| | |
|---|---|
| Parking lot repair | $270 |
| Sign repair | $200 |
| Replacement of broken windows | $1,100 |

| | |
|---|---|
| <u>Environmental Testing</u> | |
| Phase II and follow-on testing | $67,638 |
| Environmental expenses incurred in connection with the prospective sale | <u>$34,898</u> |
| <u>Total</u> | $104,106 |

**ORDER**

Pursuant to the foregoing Memorandum of Decision, defendants are found to have breached their contractual duties. Accordingly, judgment will enter for plaintiff, on Counts II and III of plaintiff's complaint and damages in the amount of $104,106 are awarded.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated: January 15, 2013